Good morning, Your Honor. Michael Gouda, Law Offices of John Hill. This case really involves what I guess has become a cliché oftentimes in contract law. When is a deal a deal? When is an agreement an agreement? Here, we submit that the actions of the parties during the time there was performance between the parties in this commercial transaction indicates that there was, in fact, an agreement between the parties. And the best evidence, of course, of that is the document, May 1st document, which states essentially that it is an agreement. Kagan I heard that qualifier, essentially. Well, it says agreement. It says I shouldn't say that qualifier perhaps was a misstatement. Because it does state on within the document itself that there this confirms our agreement. I think agreement is a simile for or synonym for a contract. I think it's commonly understood by. But my problem is that if all we do is rely on this letter, it's very easy for someone to have a conversation and then afterwards send a letter and says this is to confirm our agreement. But it's just me sending you a letter confirming the agreement as I describe it and even describing the fact that we have an agreement. This is not a signed agreement by two parties. Well, it is signed by the party. Whose advantage it is. No, it is signed by Tosco's representative. It's not signed. This letter was not authored by the appellants. It was authored by the appellees, the Respondents. I'm sorry. I take that part of it back, yes. And I think that's very important. Because was it the – if it was the case that that agreement was merely signed by the appellants, then it – we wouldn't have a signature on an agreement. We would have partial agreements without a contract. That is, that we agreed to all of these things, but with the understanding I don't have authority on the duration. That's fine. That's the agreement. It actually doesn't say I don't have authority on the duration. It states that the duration of the contract will have to be approved by the management. Well. It doesn't indicate they didn't. But would that be the same thing? Well, the reason why that's important is that there's no indication in the letter that he doesn't have the authority to enter into the agreement for any other clauses. Well, that's the indication if it has to be approved by the management. But it doesn't state that the contract has to be approved by management. It states that the duration of the contract, which is one thing. Isn't that a material and essential term to this contract? Under California law, a – as cited by – to this Court and to the district court, the duration of a contract may not be an essential term. And, in fact, here it states if it was to be an essential term, in this case, and if there was no issue of fact regarding it, certainly the representative of Tosco would have worded it that the contract has to be approved by Tosco. Why on earth wouldn't that be a crucial and essential term? Because it's differentiating from the regular spot agreements that they had. So the whole difference of this contract would be the fact that it's going to extend for 12 months. In truth, that itself. The existence of these spot agreements, remember, these spot agreements don't even take place, even by Respondent's statements, until after this agreement. It's not like we're signing this agreement now knowing that we've had spot agreements in the past. That's not the case. Spot agreements postdate the May 1st agreement. But there were all kinds of spot agreements. Well, that's the – For various people. The problem is this. And just that that, as Your Honor points out, is reason to remand to the district court, because under established law, if there are several agreements between the parties, and it's difficult – the existence of several agreements between the parties itself would be an issue of fact as to which agreement is binding between the parties. And that is – the citation for that is within our brief. And what did you just say? Well, what Respondents are saying is that this May 1st agreement was not – may have been an agreement, but it was modified by subsequent spot agreements. There's two things wrong with that. If you think there's something technically wrong with that May 1st agreement as to having two signatures, look at the spot agreements. They're not signed by anyone. And it's fairly – They don't have any duration. And they don't have any requirement that management approve it. That's correct. You sold them oil, and you got paid on the spot agreement price. Twice. Well – And you're saying, oh, no, no, we had a 12-month contract. We should have gotten a different price. There was no – The actions of the parties come into consideration as to the interpretation of the contract. Of course. And isn't it interesting that subsequent to the May 1st letter in which the duration of the contract was to require management approval, there is the – until September wish to disengage them from what they saw as an unfavorable agreement. That is the first time they state that notwithstanding the fact that we've been dealing with you for the last four months, the duration of the contract has never – has never gotten management. But they dealt with you before the contract of May 1st, too, didn't they? They bought oil from you, spot oil. Has I – the – under the record before the district court, that's not true. There was – there were – they had discussions regarding this. Mr. Cundiff, in fact, stated that he wasn't interested in entering into agreements on a spot basis. That was my question. Had they not actually purchased oil from you before this May 1st agreement? It is my understanding, no. Oh, okay. I want to be clear on one thing. Is it your contention that the 12-month duration is not an essential part of the contract? Yes. And we cited authority for that in our briefs with regards to – especially given the fact that the contract contains a separate clause for a cancellation provision. And that cancellation provision states that it has to be on six months' notice. Only after the first 12 months. It's a 12-month evergreen with a six-month cancellation. So the first 12 months have to be 12 months. You can't do six months. Then after that one year, then you can cancel on six months. That's what evergreen means, isn't it? Well, there was no evidence presented by the respondents below indicating that that was how they interpreted it. Well, what does evergreen mean? What you want to do is take the word evergreen out of there. Well, the – I mean, evergreen to me means that every 12 months, it's another 12-month contract. And then for the first 12 months, you can cancel a six-month notice. Well, I think what's key here is this case was decided on summary judgment. It was decided on a record that was not fully developed below. Here, the – there is nothing in the record indicating Respondents interpreted that provision as Your Honor has. I'm looking at this as a situation where the whole idea was to create a different relationship with this particular supplier for 12 months because they wanted to have a difference with spotting ones. Well, that had to be approved, to have the 12 months. And I can't see how that isn't an essential part of the agreement, of the contract. Under California law, if the – a duration provision under agreement is not an essential term of an agreement, and the contract can be performed without – and a reasonable duration period will be implied by the courts. But what case – you've mentioned California law three times. Let's get right down to it. What's your best case to say that an agreement that says 12 months evergreen, six-month cancellation notice, that is not an essential term of the agreement when you've got a different price for the long-term agreement than you do for spot? Well, Your Honor, with regards to the – I'd really be interested in that case. Well, we cited below consolidated theaters, and that was a 1968 case, 69, Cal Second, 713. And it was for the proposition that the duration of the contract is not essential, and the fact that there's no duration and it's fallen out of the agreement doesn't render the entire contract fatally uncertain. The district court found that the reason why that case did not apply is because in – the district court found that in consolidated theaters there was no issue as to whether or not there was an underlying agreement between the parties that existed independent of the duration clause. And the district court found in this case that the Tosco disputes the existence of the agreement. However, there's – as we stated, we don't see any – the mere fact that one party to the agreement subsequent to a lawsuit being filed continues to assert that there was no agreement does not render the entire matter – well, moot under the consolidated theaters analysis. The court still has to determine whether or not there are any issues of fact as to whether or not an agreement exists between the parties. I think that the mere statement made by – and it's very important that it's the Tosco representative stating that there is such – this confirms our agreement, at least for summary judgment purposes, carries the day, because here there is then an issue of fact as to whether or not there is an agreement between the parties. It's not merely the statement of the appellant here. It's the statement of Tosco itself. And that representative confirmed the agreement. Now, with regards to any issue regarding to authority, for him to even say that, I think that is also rife with issues of fact. Now, this is a separate way at this case. Assuming you do have a valid contract and assuming that duration is either not a material term or we'll just assume that it lasts for a while until we hear from the management, why aren't you in breach of that contract, contracts for a minimum of 200,000 gallons a month? You never supplied 200 gallons a month of conforming oil. There's evidence in the record showing that, in fact, the appellees, the appellants had the capacity to meet that standard. It's important in this record. Had the capacity to is different from actually meeting. Well, in fact, the record indicates that – The record indicates that you shipped a lot of oil that didn't conform. Well, we shipped a lot of oil that did conform and that was bought by a third party. The Sprott deposition and his evidence confirms that. Well, I don't know why you didn't ship it to Tosco. Because Tosco wouldn't accept it. Tosco, at this point in time, realized that it had a bad agreement and it didn't want to purchase the oil pursuant to that agreement. But the mere fact that market conditions changed – Maybe this is in the record and I missed it. Did you tender that oil first to Tosco and they refused to accept it? That's correct. At what point did that happen? Did that happen after they had found your other oil nonconforming to the terms of the contract? In fact, well, it happened after Tosco realized that the – No, I've got a different question as to after. Did it happen after you shipped oil to Tosco that did not meet their requirements? Well, what's important is this. You answer my question first and then you can tell me what's important. Yes. There were shipments that were sent to Tosco that Tosco stated did not meet their requirements. Correct. Subsequent to that, Appellant sent shipments to Tosco that did apparently meet Tosco's requirements because it accepted them. Right. Subsequent to those shipments, and then when it was very clear as to whether and what the market conditions would be, Tosco said, we're not going to buy any oil from you. We don't like the price under that MAFTA. Now, how long is the time frame during which you are shipping oil to Tosco, some of which complies with their requirements, specifications, I'll say it that way, so we're not talking volume, some of which comply with their specifications and some do not. How long a time period are we talking about? Several months? That's 120 days. I should say about 100 days. 100 days, so what, a little over three months? Yes. So during a little over a three-month period, how much oil did you supply to them that actually satisfied their requirements? Between 100 and 200 gallons. But if it's a three-month period, it should have been 600. Yes. The evidence is, however, that during that period of time, well, in September, there was approximately 300,000 gallons that did meet Tosco's specifications, and the reason why we know it met Tosco's specifications is because Tosco bought it. They just didn't buy it from Riverbank, and that's the evidence. Right. Was that oil ever shipped by you directly to Tosco? They then tested it and said, we don't want it? No. No. There's no evidence that that didn't conform. In fact, the record is pretty clear. It must have because Tosco … In the end, they take it. Tosco took it. Unless they've got different specifications when they take it from somebody else. Right, but there's nothing in the record indicating that that was the case. But why isn't Tosco entitled, after you've failed during a three-month period, to meet the 200,000 gallon per month at certain specifications? Why aren't they entitled to say, you know what, we might have had a deal, but we don't now? Well, but the problem is they didn't. They may have been entitled to, but they didn't do it, and the reason is is because the indication is that Tosco didn't see it as a breach that would rupture that agreement. Apparently, Tosco was still hoping, hedging its bets on the market, thinking that the market would perhaps go the other way, and they wanted to bind Riverbank to that agreement. So there's no notice of none that the contract did not come into fruition until after they accepted hundreds of thousands of gallons of oil, and then later in September said, well, now we'd like a do-over. The market is in the market price is not favorable given this contractual formula. And now we want to see. But they never accepted it from Riverbank. Yes, they did. They said it. It came, went through a third party. We're talking about several different shipments. Almost something like 200,000 gallons, under 200,000 gallons were accepted from Riverbank. Over 300,000. Under, under 200,000. That's correct. That's correct. And over about 300,000 gallons were accepted through a third party. The issue really is, is that a breach of a contract itself does not end the contract. The person who is claiming a breach has to give notice of the breach. Now, it is true. It's only if the person believes he has a contract. Well, that's the problem here. If, that's correct. That's correct. But that's why the positions are not really good for a summary adjudication motion. Because to the extent that the evidence shows that there was a contract, then there would be an issue of fact as to whether or not Tosco had a duty to provide notice of a breach. Here, Tosco is saying, we didn't have a contract, and or, even if we did, you breached it. But they don't meet, for purposes of summary judgment, those are inconsistent positions. And the position, the fact that they, they could say, well, we didn't send the notice because we really didn't believe there was a contract. Well, you don't have to agree now that there was a contract. The Court finds, and it can, that for purposes of summary judgment, your statement that there's a contract creates issues of fact as to whether that's an agreement. And you took a risk in not sending notices of a breach. If you didn't think that was an agreement, perhaps you had an incorrect statement of what the applicable facts in law are. I'd like to reserve the balance of my time, if I could. Thank you. May it please the Court. I'm Paul Fogel for Appalese. The district court found four reasons why there was not a meeting of the minds as to this May First letter being a contract. A couple of them have been identified by the panel. One was duration. I mean, it, it says right, black and white, the contract duration will require management approval. And remember, Mr. Cundiff on the other side, Riverbank, he's asked a deposition. Do you know why Mr. Larson wrote that? Because Larson just, Larson had written that statement. No. Did you discuss it with him? He indicated he was not the final authority and that he would send this on for approval. Was your understanding that he had would need to get final approval before this would become a deal? It was my understanding he had to do something. I don't know exactly what he had to do. But then he's asked later, actually the same in the next breath, he's asked, did Mr. Larson ever, at any point, ever tell you that he had obtained management approval? No, he did not. Did he ever tell you that the duration would not require management approval? No. Pages 67 to 68 of the excerpts. One, duration. Two, quantity. The so-called contract says, let's see, two, contract will be for a minimum of 200,000 gallons a month. Now, that's what Larson wrote in this letter. But Mr. Cundiff testifies, well, we didn't really have to do 200,000 a month. We could actually do zero one month and 400 the next and maybe 100 after that, as long as it came out to 2.4 million, 2.4 million over 12 months. District court identified that as not being a meeting of the minds because we think we're going to get 200,000. That's what we want. That's why we're entering into a long, if we are, into a long-term deal. We need regular. We don't need 2.4 in December. We want 200,000 a month because we have people we're selling this to who need it. Third problem, price. You notice that this May 1st letter specifies a way to calculate the contract price. It then says at the end, any specific adjustments necessary for freight, rail costs, rail car costs, testing, and local transportation costs to be negotiated at a subsequent date. So we believe that there's a formula price and then we'll negotiate for transport, testing, and freight later. Mr. Cundiff believes, look at excerpts of Record 34, that the price reflected in here, meaning the formula price, is a net price. So that, you know, we don't deduct from that the price, the cost of freight and transportation. Why do we know that? Because in the spot contract that we negotiate with them, and they agree to end pay, by the way. So let's get straight here. They did pay. In fact, they said they never received the spot contract, the faxes. The Larson Declaration establishes that they did, but they paid. So it's funny that they're paying for stuff, paying for a spot contract they never received. Cundiff says in his letter that he's, when he's protesting Larson's price, he says, that price in that May 1st letter was a net price, not a gross price. You can't deduct your freight and testing and transportation from that. So that's a third reason why the district court found no meeting of the minds. Fourth reason. Excerpts of Record 207, which is Cundiff's deposition. He says, well, we hadn't determined the precise amount that was going to be required for freight, testing and transportation. And the district court identifies that at ER 273 as another reason why there's not a meeting of the minds. So we have this so-called contract on which they're, you know, resting everything here that has at least four defects in, I would say, material terms. I'll give you a fifth if you want it. And that is this letter keeps using the verb formulation will be. Fuel will be. Contract will be. Doesn't say contract is. Right. OK, I'll accept it. I thought you might. Let's go to this. I think you have been given a lot of information by the other side that really is inaccurate. And I really ask you to read Mr. Sprott's depo. He's, remember him, he's Cascade. Now, what happens here is Riverbank ships this oil to someplace called, a company called Cascade. And they hold it and then they test it or they reprocess it. I mean, we actually sent an independent lab, Columbia, to test it. And then it comes our way. Now, it turns out we've been told here that this so-called 300,000 gallons, which, by the way, you're being told, you were told today it was conforming oil. Mr. Sprott is asked that question. He's the only witness that opines on that question. And he's asked, well, was it conforming? Did it conform to Tosco's specs? And he says, I don't know. I assume it did because Tosco eventually bought it from Emerald. But as you said, Judge Fletcher, we don't know what Tosco's specs with Emerald were. We're not denying that it came to us eventually because there's testimony about bills of lading and so forth, that it eventually made its way to us. But we don't know what Tosco, what the Tosco Emerald agreement was and whether those specs were the same specs in this May 1st letter. So, but let's put that aside. Let's assume that it was conforming. You have not been told the full story. And if you read Mr. Sprott's deposition, you will see that the 300,000 gallons that allegedly came to Cascade and that were allegedly tendered to Tosco were never tendered to Tosco. That's because Cascade and Tosco, Cascade and Riverbank had a dispute. And Cascade had not been paid for something. And it was owed then a debt. And the way Riverbank took care of that debt was to give Cascade, not Tosco, Cascade 300,000 gallons, which Cascade could do whatever it wanted with that oil. So then Cascade doesn't give it to Tosco, gives it to Emerald, doesn't give it to Emerald, sells it to Emerald, and then Cascade is made partially whole on its debt. So the notion that this was tendered to Tosco is wrong. But let's ignore that. Let's pretend it was tendered to Tosco. Okay. So how many gallons of conforming oil do we tender, are we offered in a three-month period? And let's assume that that 300,000 was at the end of July. So that's three months, right? May, June, July. We're supposed to get a minimum of 600,000 gallons. Well, let's say we got 300 in July. Don't think we did, but let's say we did. Do we get another 300? No. We get seven railcars sent to us starting in late May and ending in about mid-July, maybe a little bit into August. Only two of those shipments conform. All the rest of the stuff doesn't conform because we have it independently tested. Now, they made some noise in the district court about, oh, our testing was flawed and we took it off the top instead of the middle and blah, blah, blah, but they don't really develop that on appeal. They, in fact, abandon that issue. Okay. Long story short, if you add up the two quantities on the spot contracts, 76,000 and 58,000, you end up with 134,000 gallons. Let's add to that the non-received, non-tendered, non-conforming, we don't know if it was conforming, 300,000 and you get up to about 440,000. That's the best they do. We're still 160,000 gallons short. So if that's not a material breach, that's quite a large percentage of 600,000. If that's not a material breach, I don't know what is. Now, this notion that we had to give written notice, I don't know where that comes from. I haven't seen any authority that says we have to give them written notice that their oil is not conforming. You know, it's kind of strange. It wasn't really a surprise, was it? I mean, we rejected so many tanks, so why do we have to tell them, oh, you're materially breaching, by the way? I mean, isn't that pretty powerful, the act of rejecting tendered goods? Doesn't that communicate that there's a breach? And then what about Mr. Larson when he calls up? Look at his declaration. He calls up Mr. Cundiff on July 29th and he says, you know, this really is not working. You know, you've given us his, I'm sorry, Mr. Cundiff, Bill, we're no longer going to consider entering into a long-term contract or doing business with you. Now, at the hearing in the summary judgment motion, Riverbank disputed that we ever gave such notice, but neither Cundiff nor Dahlgren, who's Riverbank's president, ever contradicted Larson's statement. And that's the district court so noted. Cundiff, in his declaration, talked only about a 190-degree flashpoint. He didn't say anything about that conversation. Dahlgren says, I don't remember. He was asked, did you have any conversation or did Bill have any conversation with Dave about, you know, this nonperformance? I don't remember. Then Larson in his depo says, look, we had to have $200,000 a month. We didn't have it, and it wasn't working for us. And it had to be on specs, and it had to be a minimum. And we never, quote, everything was falling apart on attaining that. We never got to $200,000. That was very, very important to us. The product didn't meet our specs, and the company that was processing for Riverbank, Cascade, couldn't bring it into specification, and there was no product that was forthcoming that would meet $200,000 a month. He said there were Kennedy. Wouldn't that be an indication that there was an agreement for $200,000 a month? All this talk about not meeting the $200,000, isn't that some indication that they were accepting this as a contract? Judge Hug, that's a very good question. You know that, of course, you can waive the statute of limitations. You can waive defects in a written agreement, even defects in which you say you're going to eventually turn into a written agreement by performance, by part performance. So to tell you the truth, we needed oil. We needed lots of oil. And probably we were willing to accept plenty of oil, at least 200,000 gallons a month, if it conformed. So maybe we would have ---- What you had said earlier is that you're not providing the 200,000. Right. And which would indicate the 200,000 was the basis for this contract that you say didn't exist. Well, we have ---- I believe we are entitled to have alternate bases for summary judgment. The first basis was no meeting of the minds, no contract. Management approval was an essential term that could not be implied. But if there was a contract, if this May 1st agreement was a contract, then they materially breached, and under the law, a material breach gives rise to a ---- I understand the alternate theories. But the statement of license ---- Right. ----that you just quoted wouldn't indicate that there was an agreement. It would indicate that he was willing to accept 200,000 a month, and that would be performance under the May 1st letter. You're right. I mean, I'm not going to deny that we would reject conforming oil. And I'm not going to deny that Larsen, had we been given 200,000 a month, you know, that conformed, we probably would have either overlooked ---- Honored the contract. We would have overlooked the management approval requirement, or we would have gone quickly to Phoenix and said, give me approval, this is working. But as it turned out, I mean, why ---- I'm not sure we have to really justify what we did, because there's no dispute that there wasn't conforming oil that was coming, and the quantity that we got was nowhere near 600,000. Mr. Fargo, one other question. As to the oil that you did accept, was the price paid, the purported May 1st price, or was there some other price paid? No. The price ---- it was some other price. The price on ---- there are two spot contracts, one for 76,000 and one for 58,000. 76,000 was for 45 cents minus freight transportation and testing coming out to 39.5. The formula price for that oil would have been 46.4 cents. Now, you may say, well, 46.4, 45, you know, big deal. But that's when you get into this, well, what's the contract, the so-called contract price? Is it gross or is it net? In other words, is it 45 minus the transportation giving you 39.5, which is a significant disparity. So you were treating the spot price as net. No, pardon me, gross. That's right. Second contract is even more of a disparity. That's for 58,000. Now, remember, that happened after Mr. Larson called up Cundiff and said, Bill, this is not working, forget it. Dahlgren then calls Larson. Hey, look, we already shipped you a bunch of oil. Would you take it? And Larson says, okay, on a spot basis. And that's the 58,000. Guess how much the price was for that? 19 cents. The so-called formula price would have been 49 cents. So we have a 30-cent differential on 58,000 gallons. I haven't calculated that, but it's not chicken feed. So unless the Court has any questions, I'll submit. Thank you. You've saved a little time. I'm sorry? You have saved a little time. Oh, thank you very much, Your Honor. I think a key aspect, of course, of this is the so-called spot contracts. Much investigation has gone into this May 1st agreement, whether or not that is a binding bilateral agreement between the parties. I submit that if we look at those spot contracts, so-called spot contracts, they don't meet the definitions, the factual and legal requirements for an agreement. One, they're not signed by the appellant. And, in fact, the appellant stated he'd never actually seen it. But nobody's claiming that those are the contracts in dispute. Nobody's trying to enforce a memorandum signed by a party to those contracts. But if the agreement, if that May 1st agreement was modified, the point is, is this. If those supposed spot contracts are the evidence that the May 1st agreement wasn't the real deal between the parties, there has to be no issues of material fact that those spot contracts are bilateral agreement. There's no way that that would meet that standard. Those spot contracts, there are issues of fact as to whether or not they constitute a bilateral agreement between the parties. In fact, the evidence was, as discussed in our brief on page 25, that the parties, the agents for both parties to the agreement, never actually saw the spot contracts. Mr. Lennon, the agent for the Tosco, stated in his deposition he had never even seen the agreement, supposed agreements. He stated that on page 76 and 79, the ER 212, 213. That's the problem. You're now over your rebuttal time. Do you want to just wrap up? We'll give you half a minute or so. Thank you, Your Honor. I think that is the problem. You can take alternative positions in litigation. That's fine. But for purposes of summary judgment, if you cite evidence indicating that there was a breach of an agreement, that is evidence, in fact, indicating there was an agreement. If you cite evidence that the – and I think that's the material problem with the defendant's position in having the summary judgment motion be granted. You can take alternative positions. If a jury or a judge hears the case as ultimate trier effect, that's one thing. But for summary judgment purposes, that's a problem. Okay. Thank you very much. I thank both sides for your useful argument in this case. The case of Riverbank Oil Company v. Tosco Oil Corporation is now submitted for decision.
judges: Hug, W. Fletcher, Bea